Charles J. FRANKEL, et al., Plaintiffs,

v.

WYLLIE & THORNHILL, INC., et al., Defendants and Third-Party Plaintiffs,

v.

Edward H. DEETS, Jr., Third-Party Defendants and Defendants.

Civ. A. No. 72–C–5–C.

United States District Court, W. D. Virginia, Charlottesville Division.

April 15, 1982.

Edward B. Lowry, Michie, Hamlett, Donato & Lowry, Charlottesville, Va., for plaintiff.

George R. St. John, Charlottesville, Va., Robert L. Dolbeare, Richmond, Va., Wayt B. Timberlake, Jr., Staunton, Va., Haugh & Helvin, Robert M. Musselman, Charlottesville, Va., Malcolm M. Christian, Richmond, Va., Fred G. Wood, Jr., Charlottesville, Va., T. L. Plunkett, Jr., Roanoke, Va., John W. Edmonds, III, Richmond, Va., T. Munsford Boyd, Charlottesville, Va., John O. Peters, Richmond, Va., Paxson, Smith, Boyd, Gilliam & Gouldman, Inc., Charlottesville, Va., Jeffrey M. Zwerdling, Richmond, Va., Robert E. Taylor, Lloyd T. Smith, Jr., Charlottesville, Va., for defendants.

*Memorandum Opinion and Order*

TURK, Chief Judge.

This is an action to redress alleged violations of § 10(b)[1] of the Securities Ex-

---

1. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides that it shall be unlawful for any person:

To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest, or for the protection of investors.

Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

change Act of 1934 and § 12(2)[2] of the Securities Act of 1933. Currently before the court is the motion for summary judgment of National Bank and Trust Company ("National Bank"), a defendant and third-party defendant. The standard to be applied on such a motion is well-settled: granting the party opposing summary judgment the benefit of all favorable inferences that can be drawn from the evidence before the court and resolving doubt as to the existence of any genuine issue of fact against the moving party,

> summary judgment 'should be granted only where it is perfectly clear that no issue of fact is involved * * * and this is true even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom.'

*Johns Hopkins Univ. v. Hutton*, 488 F.2d 912, 918 (4th Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974).[3] *See also Cram v. Sun Ins. Office, Ltd.*, 375 F.2d 670, 674 (4th Cir. 1967).

Applying this standard to the facts of this case, as they pertain to National Bank and are summarized below, there remain factual and inferential disputes that can be resolved only by a trier of fact. Accordingly, the motion for summary judgment will be denied. The court writes here not to demonstrate the inappropriateness of summary judgment, which is apparent from the factual disputes engaged in by the parties in their briefs, but rather to settle questions of law necessary to speedily and efficiently bring this litigation finally to a close.

## I. Summary of the Facts

This controversy arose from the inadequacy of collateral securing thirteen series of first deeds of trust real estate bonds issued to the public by O'Neill Enterprises, Inc. in 1969 and 1970. Frank A. O'Neill, president and together with his wife sole stockholder in O'Neill Enterprises, Inc., was engaged in the 1960's and early 70's in the purchase, development, and sale of real estate in the Charlottesville, Virginia area. He originally secured his financing through bank loans, but in 1969 turned to real estate bonds as a further source of capital. Between April 15, 1969 and August 15, 1970, O'Neill Enterprises, Inc. issued first deeds of trust real estate bonds totalling $4,285,-000, purportedly secured by properties owned by the corporation worth far more than the amount of the issues.

Following serious financial difficulties, the O'Neills and their corporation were adjudicated bankrupts by this court early in 1972. At the same time it was discovered that the properties held by the corporation securing the O'Neill bonds were insufficient to redeem the bonds. This action was then commenced by eighteen bond purchasers against Wyllie & Thornhill, Inc., the Charlottesville brokerage firm that had underwritten and marketed the bonds.[4] After 331 bondholders had intervened as plaintiffs, the suit was certified as a class action by order of May 10, 1972. *Frankel v. Wyllie & Thornhill, Inc.*, 55 F.R.D. 330 (W.D.Va. 1972).

---

**2.** Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), provides, in part:

Any person who—
(2) offers or sells a security ... which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity

in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

**3.** The inner quote is from *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).

**4.** Plaintiffs also sued the officers and directors of Wyllie & Thornhill, Inc., and Don E. Burch, the accountant who had prepared the financial statements of O'Neill Enterprises, Inc. The officers and directors have since been released from the suit.

Plaintiffs' original complaint alleged numerous violations of federal securities law. The prospectuses, or "new issue sheets," disseminated by Wyllie & Thornhill, Inc. allegedly contained misrepresentations and omissions of material fact and were not registered either with the Securities and Exchange Commission or with the Virginia State Corporation Commission. The balance sheets of O'Neill Enterprises, Inc. used by Wyllie & Thornhill, Inc. in connection with the issuance and sale of the O'Neill bonds also allegedly contained misrepresentations and omissions, chiefly failing to disclose the fact that O'Neill Enterprises had been operating at an annual loss in excess of $1,000,000.

Plaintiffs complained that the deeds of trust securing the O'Neill bonds contained a provision for the "substitution of collateral" which could be utilized by the trustees alone without notification or consent of the bondholders and which was in fact employed without their knowledge or consent. The appraised values of the properties used for these frequent substitutions or collateral were allegedly much higher than the real market values, thus substantially impairing the actual value of the bonds.[5]

On May 24, 1972, Wyllie & Thornhill, Inc. and its two principal officers filed a third-party complaint against those they believed primarily responsible for the plaintiffs' losses. Among those sued were William E. Bell and Alvin R. Clements, two of the appraisers who had valued the properties securing the bonds, and National Bank and Trust and Citizens Bank and Trust, the employers of Bell and Clements respectively.[6] The third-party complaint alleged in particular that the appraisers, and their employers, were aware that their appraisals were being used in connection with the issuance and sale of the O'Neill bonds and that they represented that their appraisals accurately reflected the true values of the properties.[7] On October 10, 1972, plaintiffs filed a third-party claim under Rule 14(a) directly against the banks and their appraisers, and other third-party defendants, restating in substance the allegations of Wyllie & Thornhill's third-party complaint.

For six years following the entry of the third-party defendants into this suit, all activity ceased. Early in 1979 the litigation resumed and, after extensive discovery, plaintiffs amended their complaint on July 14, 1981 with leave of court to include expanded allegations against the banks and the appraisers. The crux of plaintiffs' allegations can be simply stated as follows: Plaintiffs allege that the appraisers, acting within the scope of their actual or apparent authority as officers of the banks, performed appraisals on the O'Neill properties knowing or recklessly disregarding knowledge that the values they assigned to those properties grossly inflated the actual fair market values, and knowing or recklessly disregarding knowledge that their appraisals were being used in connection with the issuance and sale of the O'Neill bonds.[8]

The appraisals unquestionably played a crucial role in floating the O'Neill bonds. The commitment letters from Wyllie & Thornhill, Inc. to O'Neill Enterprises, Inc., stating the terms under which the bonds would be underwritten and marketed, required, among other things, appraisals from one bank officer from a Charlottesville bank and another from an appraiser of O'Neill's choice reflecting a required ratio of the value of the collateral to the princi-

---

5. Plaintiffs also alleged that Wyllie & Thornhill, Inc. had entered into oral and written repurchase agreements with some of the bondholders which had operated as a fraud on the remainder of the purchasers; and that it continued to market the O'Neill bonds after it knew or should have known that the Virginia State Corporation Commission had refused in the summer of 1970 to accept further registration statements from O'Neill Enterprises.

6. Also sued were the O'Neills, their corporation, and their trustee in bankruptcy; Edward H. Deets, Jr., the secretary and attorney for O'Neill Enterprises; and Thomas J. Chandler, an independent appraiser.

7. Defendants' Third-Party Complaint, p. 9.

8. Plaintiff's Amended Complaint and Claim Against Third-Party Defendants, ¶¶ 29-34, 37-39.

pal amount of the bond issue.[9] The "new issue sheets" circulated to the public by Wyllie & Thornhill, Inc. represented that William E. Bell, a Vice-President of National Bank, and Alvin Clements, Executive Vice-President of Citizens Bank, had appraised the property securing the bonds at a value more than sufficient to cover the amount of issue. Further, the appraisals were used in the O'Neill balance sheets, allegedly to inflate the capital of the corporation and to mask its continuing losses.

The role of the appraisals is clear. Without appraisals reflecting sufficient value on the properties used to secure the bonds, the ratio of debt to collateral required by the commitment letters and by the deeds of trust could not have been established and the bonds could not have been issued. Similarly, without such appraisals, there would be no way to show on the required financial statements that the net worth of O'Neill Enterprises, Inc., allegedly operating at the time at an annual loss of $1,000,000, was in the black.

Also clear is the present posture of the case, renewed after a hiatus of six years. Plaintiffs never asserted claims against the O'Neills and their corporation, as the adjudication in bankruptcy had rendered them judgment-proof. Having determined that a substantial recovery is also unlikely against Wyllie & Thornhill, Inc., which has long been out of business, plaintiffs are now pressing their claims against the appraisers and the banks. The banks are strenuously objecting to the attempted "transfer" of liability from the original defendants to parties who, they argue, were involved peripherally, if at all, in the alleged scheme to defraud. But sufficient facts are present in the substantial record developed in this case to raise a genuine dispute concerning the degree of *scienter* on the part of the appraisers and their banks. Whether they only negligently failed to discover the role they undoubtedly played in floating the O'Neill bonds, or whether they suspected

their role and recklessly closed their eyes to it, or whether they knew affirmatively of that role and consciously furthered the alleged scheme of the primary parties, are questions only a trier of fact can resolve. Here the court writes only to settle legal issues necessary to prepare this case for trial.

## II. *Reliance and "Fraud on the Market"*

■ Reliance by the plaintiff on a misrepresentation or omission of material fact knowingly or recklessly made by the defendant is an element of Rule 10b–5 liability. *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 186 (3rd Cir. 1981); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 543 (5th Cir. 1981). *See generally* Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 Harv.L.Rev. 584 (1975). But the necessity of proving an element of a claim does not necessarily determine the allocations of the burdens of going forward and persuasion with respect to that element. *Sharp v. Coopers & Lybrand*, 649 F.2d at 187; McCormick's Handbook of the Law of Evidence, § 337, at 785–86 (Cleary ed. 1972). In appropriate circumstances the plaintiff will be relieved of the burden of introducing evidence of reliance and will be granted a rebuttable presumption that such reliance occurred. Thus in cases involving primarily a failure to disclose rather than an affirmative misrepresentation, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972).

> All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making [the investment] decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

*Id.* (citation omitted).

Evidence of reliance is also not required in cases alleging what has come to be

---

9. At least one of the commitments was based on "two appraisals from two bank officers from two Charlottesville banks" already on file at Wyllie & Thornhill, Inc. At least two of the commitments required appraisals "from two appraisers mutually acceptable to both Wyllie & Thornhill, Inc. and O'Neill Enterprises, Inc." The amount of appraised value required ranged from 150% to 178% of the bond issue.

known as a "fraud on the market" theory of liability. Such cases generally fall into three categories. The first and most common, typified by *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), involves a deception inflating the price of stock traded on the open market.[10] The theory has been succinctly stated as follows:

> To prevail under this theory, plaintiffs must demonstrate that defendant's misrepresentations and omissions were a part of a common scheme to manipulate the value of stock and that the defendant's fraudulent activities caused an artificial inflation of the market value. The plaintiff need not prove individual reliance upon the particular misrepresentation or omissions of defendants. Rather, the plaintiffs must prove that the facts misrepresented or omitted by defendants were material and affected the market value of the stock purchased. Once plaintiff has satisfied this burden, reliance is presumed and the burden shifts to the defendants to rebut that presumption.

*Sargent v. Genesco*, 75 F.R.D. 79, 84–85 (M.D.Fla.1977). *See also In re LTV Securities Litigation*, 88 F.R.D. 134, 142 (N.D.Tex. 1980); *In re Scientific Control Corp. Securities Litigation*, 71 F.R.D. 491 (S.D.N.Y. 1976); *In re United States Financial Securities Litigation*, 69 F.R.D. 24 (S.D.Cal.1975); *Tucker v. Arthur Andersen & Co.*, 67 F.R.D. 468 (S.D.N.Y.1975); *Werfel v. Kramarsky*, 61 F.R.D. 674 (S.D.N.Y.1974).

The second category of "fraud on the market" case is typified by *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). In *Schlick* plaintiff alleged that a fraudulent proxy statement was one step in a scheme to manipulate stock prices to establish an unfair exchange ratio in a forced merger. The specific holding of the court was that a plaintiff alleging a loss as a result of a fraudulent scheme to bring about a forced sale of his security need not plead or prove reliance, since he has made no decision to participate in the transaction. *See Shores v. Sklar*, 647 F.2d 462, 479–81 (5th Cir. 1981) (Randall, J., dissenting); *see also Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 797 (2d Cir. 1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 635 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967).

The third and most recent theory of "fraud on the market," and the one relied upon by the plaintiffs here, is found in *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981). There the court held that if securities were proved entirely unmarketable but for the fraudulent scheme of the defendants, plaintiff would be relieved of proving reliance on specific misrepresentations or omissions and would be allowed to plead and prove re-

---

**10.** The court in *Blackie* observed that

> causation is adequately established in the impersonal stock exchange context by proof of purchase and of the materiality of misrepresentations, without direct proof of reliance. Materiality circumstantially establishes the reliance of some market traders and hence the inflation in the stock price—when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case.

*Blackie v. Barrack*, 524 F.2d at 906. The rationale of this type of "fraud on the market" case is explained in full by Judge Higgenbotham in *In re LTV Securities Litigation*, 88 F.R.D. 134, 142–44 (N.D.Tex.1980):

> With recent advances in the understanding of the economics of securities markets, it has become more demonstrable that reliance on the market price is conceptually indistin-

guishable from reliance upon representations made in face-to-face transactions.

> \* \* \* \* \* \*

> Thus, the market is performing a substantial part of the evaluation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

> \* \* \* \* \* \*

> Recent economic studies tend to buttress empirically the central assumption of the fraud on the market theory—that the market price reflects all representations concerning the stock.... The fraud on the market theory does not eliminate the element of reliance but places it where in open market transactions it belongs—connecting the purchaser to the market, not the specific misstatement.

liance on the "integrity of the market". *Sklar* involved first mortgage revenue bonds issued by an Industrial Development Board, the proceeds of which were to be used to construct a manufacturing plant. The lessee of the plant, the sole source of income necessary to amortize the bonds, almost immediately defaulted on the rent, rendering the bonds worthless. A bond purchaser then brought a class action suit against all participants in the bond issue, including the trustee bank, bond counsel, underwriter, and accountant. The class representative brought his claims under all three subparagraphs of Rule 10b–5. Because he had not read the offering circular on the bonds, and thus could not allege that he relied upon the alleged misrepresentations it contained, the district court entered summary judgment against him. The Fifth Circuit, sitting *en banc*, reversed as to the claim under subparagraphs (a) and (c).[11] It held that plaintiff's complaint

> would permit proof that the defendants engaged in an elaborate scheme to create a bond issue that would appear genuine but was so lacking in basic requirements that the Bonds would never have been approved by the Board nor presented by the underwriters had any one of the participants in the scheme not acted with intent to defraud or in reckless disregard of whether the other defendants were perpetrating a fraud.

*Id.* at 468. In connection with the issue of reliance the court observed:

> [T]he reason for the reliance requirement "is to certify that the conduct of the defendant actually caused the plaintiff's injury." [Citation omitted]. Whenever the rule 10b–5 issue shifts from misrepresentation or omission in a document to fraud on a broader scale, the search for causation must shift also. The "reliance" that produces causation in the latter type

of case cannot come from reading a document. It may arise from a duty to speak, as in *Ute*, a scheme to manipulate the market at a time when a merged had forced a sale, as in *Schlick*, a scheme to inflate common stock prices by misleading statements, as in [*Blackie*,] or a claim by a bond buyer that he relied on the market to provide securities that were not fraudulently created as we have here.

*Id.* at 472.

The Fourth Circuit has yet to rule on the viability of the "fraud on the market" approach to securities fraud liability, whether of the inflated stock prices, the forced merger, or the unmarketable securities type. This court anticipates, however, that the Fourth Circuit will join the Second, Fifth, Sixth, and Ninth in recognizing such a theory in an appropriate case. Further, this court believes that this is such a case, as the facts alleged by plaintiffs and adduced in discovery bring this case squarely within the narrow adoption of the "fraud on the market" theory of liability characterized by *Sklar*. Bearing in mind that the remedies provided by the Securities Exchange Act should not be construed technically and restrictively, "but flexibly to effectuate its remedial purpose of achieving a high standard of integrity in the securities industry," *Sargent v. Genesco, Inc.*, 75 F.R.D. 79, 84 (M.D.Fla.1977), the court is unwilling to foreclose a theory to plaintiffs that may be borne out at trial. Accordingly, National Bank's motion for summary judgment on plaintiffs' allegations of "fraud on the market" will be denied.

It must be noted, however, that the validity of plaintiffs' "fraud on the market" theory does not relieve them of the burden of introducing evidence of reliance—it merely alters the nature of the reliance that must be proved on their 10b–5(a) & (c) claim. Moreover, plaintiffs are still faced

---

11. The court affirmed, however, the entry of summary judgment to the extent that plaintiff pleaded the usual misrepresentation or omission case under subparagraph (b) of Rule 10b–5, noting that reliance is always an essential element of such a claim.

> [Plaintiff's] claim that he was deceived by the misrepresentations and omissions of the Offering Circular was correctly dismissed by the district court because of his failure to read or even seek to read the Offering Circular.

*Shores v. Sklar*, 647 F.2d at 468.

with the burden of introducing evidence from each of the more than 400 absent class members on the misrepresentations claimed in their 10b–5(b) allegation. For considerations independent of those set forth above in discussing the "fraud on the market" claim, plaintiffs will be relieved of that burden.

Initially the court observes that plaintiffs are not limited simply to an allegation of reliance on the appraisals themselves or on the representations of bank officers. Secondary reliance on the new issue sheets is sufficient.

> [T]he fact that plaintiff[s] must trace [their] reliance on defendants' alleged fraud through the reaction of third parties does not vitiate [their] claim under 10b–5.

*Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir. 1981); *see also Walsh v. Butcher & Sherrerd*, 452 F.Supp. 80 (E.D.Pa.1978); *Dorfman v. First Boston Corp.*, 62 F.R.D. 466, 478 (E.D.Pa.1974). The doctrine of secondary reliance is particularly appropriate in this case, in which plaintiffs' crucial allegation against the banks and appraisers is that they knew or recklessly disregarded knowledge that the appraisals were being used in connection with the issuance of the O'Neill bonds. Assuming that this allegation is borne out at trial and that plaintiffs will be able to show also that the banks and appraisers could reasonably expect potential investors to rely upon the information contained in or omitted from the appraisals, the defendants had a duty not to stand mute while such foreseeable reliance took place. *See Affiliated Ute*, 406 U.S. at 153–54, 92 S.Ct. at 1472.

The question remains, however, whether plaintiffs will be granted a rebuttable presumption of reliance. Plaintiffs argue that "reliance" and "causation" are in fact identical elements of Rule 10b–5 liability and that proof of reliance should not be required where it is unnecessary to establish causation. The Fourth Circuit expressed such a sentiment when it stated, in *Johns Hopkins Univ. v. Hutton*, 488 F.2d 912, 914–15 (4th Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118, that "the essentiality of the tainted information satisfie[s] the accepted criteria of reliance ...." [12] Plaintiffs cite this case, and cases from other jurisdictions as well, for the proposition that the requirement of reliance serves only to certify that the conduct of the defendant was a substantial factor in determining the course of conduct resulting in plaintiffs' loss. *See, e.g., Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1283 (9th Cir. 1982); *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965). The Fourth Circuit, however, has not so held and the weight of recent authority is to the contrary. *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 n.6 (2d Cir. 1981); *Vervaecke v. Chiles Heider & Co., Inc.*, 578 F.2d 713, 715–18 (8th Cir. 1978); *Holdsworth v. Strong*, 545 F.2d 687, 695 (10th Cir. 1976). As stated recently by the Fifth Circuit:

> [R]eliance is an issue in *all* Rule 10b–5 cases. The difference between misrepresentation and non-disclosure cases relates only to whether proof of reliance is a prerequisite to recovery or whether proof of non-reliance is an affirmative defense.

> * * * * * *

Causation is related to but distinct from reliance. Reliance is a *causa sine qua non*, a type of "but for" requirement: had the investor known the truth he would not have acted. Causation requires one step further in the analysis: even if the investor would not otherwise have acted, was the misrepresented fact a proximate cause of the loss?

---

**12.** A similar statement by the Fourth Circuit is found in *Carras v. Burns*, 516 F.2d 251, 257 (4th Cir. 1975):

> When a broker misrepresents a material fact, or ... fails to disclose information that a reasonable investor would consider significant, it may be inferred that the customer would have relied on the broker's statement

or, in the case of non-disclosure, that he would have relied on the information had he known of it. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *Affiliated Ute* also teaches that causation can be established by proof of the misrepresentation or non-disclosure.

*Huddleston v. Herman & MacLean*, 640 F.2d 534, 548, 549 (5th Cir. 1981) (emphasis in original, citation and footnote omitted).

Upon this line of reasoning, then, it would be necessary to determine whether the facts of this case present either primarily a failure to disclose, invoking the *Affiliated Ute* presumption of reliance, or primarily a misrepresentation of fact, to which no presumption of reliance, either under the 10b–5(b) or the "fraud on the market" claim, would attach. *Huddleston*, 640 F.2d at 548; *Rifkin v. Crow*, 574 F.2d 256, 263 (5th Cir. 1978).

Clearly, though, and particularly under the facts of this case, every misrepresentation involves also a failure to disclose, "at least to the extent that there is a failure to disclose which facts in the representation are not true." *Little v. First-California Co.*, 532 F.2d 1302, 1304 (9th Cir. 1976). Differentiating between "misrepresentations" and "omission" is thus not an easy task, particularly where, as here, the two are intertwined in the alleged comprehensive scheme to defraud. Proof of reliance on a particular misrepresentation should not be necessary in such a case. *See Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir. 1975); *Greenspan v. Brassler*, 78 F.R.D. 130 (S.D.N.Y.1978); *Herm v. Stafford*, 461 F.Supp. 508 (W.D.Ky. 1978).

In this case plaintiffs have alleged multiple misrepresentations *and* omissions on the part of the defendants. With respect to the appraisals, plaintiffs allege that defendants omitted therefrom sales figures for comparable properties, city or county appraisals, any reference to the appraisal method used, the purchase price originally paid by O'Neill, the fact that the bank officers had no formal appraisal training, and, most important, the true value of the appraised properties. The banks argue that, at least concerning the allegations against them, this case involves allegedly inflated appraisals and by its very nature is primarily one of misrepresentation. This court is not convinced that this is so. Indeed, the court perceives no principled basis on which to determine whether the mix of allegations presented here concerning the appraisals are "primarily" of misrepresentations or omissions. Clearly they are both, "interrelated, interdependent, and cumulative ... [l]ike standing dominoes ... one misrepresentation ... caus[ing] subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous statements." *Fischer v. Kletz*, 41 F.R.D. 377, 381 (S.D.N.Y.1966). Moreover, this case involves an alleged scheme broader than simply misrepresentations of market value. The appraisals played a small, albeit crucial, role in the alleged perpetration of a larger scheme to defraud, involving a large number of participants who are parties to this suit. Faced with a welter of misrepresentations and omissions alleged against numerous defendants, the court finds no logic in requiring proof of reliance as to some defendants and some claims and relieving plaintiffs of that burden as to others. The approach of the Third Circuit faced with a similar situation is instructive. In a case involving both misrepresentations and omissions, the court observed that

> [a] strict application of the omissions-misrepresentations dichotomy would require the trial judge to instruct the jury to presume reliance with regard to the omitted facts, and not to presume reliance with regard to the misrepresented facts. Although this resolution would have great appeal to graduate logicians in a classroom, we are not persuaded to adopt it for use in a courtroom.

*Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3rd Cir. 1981). The court observed that the procedural difficulties implicit in such a complicated approach are many, and concluded that the proper approach to the problem was to "analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance," *id.* at 188, thus avoiding by this flexible approach a broad judicial pronouncement on a

difficult and unsettled issue. The court in *Sharp* determined that the most reasonable placement of the burden of proof on the issue of reliance would be upon the defendant. The court noted that the opinion letter of defendant, an accountant, was intended to influence potential investors and that defendant could undoubtedly foresee that it would have that effect. *Id.* at 189.

This court will adopt the approach in *Sharp* and seek the most logical placement of the burden of proof on the issue of reliance. In doing so, the court is mindful of the *in terrorem* effect that placing the burden of rebuttal on defendants may have. This consideration is outweighed, however, by the practical difficulties both of instructing a jury to presume reliance on some facets of the case and not on others and of requiring a plaintiff class of more than 400 members to individually present proof of reliance during the course of what already promises to be a long and complex trial. Moreover, the banks and appraisers here, as the accountants in *Sharp*, could foresee, if plaintiffs' allegations are supported at trial, that investors would rely upon the appraisals in their decision to purchase the O'Neill bonds. Indeed, it would appear that the values attached to the properties by the appraisers was the most substantial factor in the ability of Wyllie & Thornhill, Inc. to market these first deed of trust bonds. Under these circumstances, the court believes that logic and procedural efficiency require that the defendants bear the burden of disproving reliance on the part of the plaintiffs.

### III. *Scienter and Respondeat Superior*

Negligence alone is insufficient to support liability under Rule 10b–5. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Supreme Court has left open, however, the question whether recklessness satisfies the intent requirement. The courts that have addressed this issue have generally held that it does. *See, e.g., G. A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 960–62 (5th Cir. 1981); *IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir. 1980); *Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir. 1978); *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023 (6th Cir. 1979); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir. 1977). *See generally* Annot., 49 A.L.R.Fed. 392. The classic and oft-quoted definition of recklessness in securities cases is stated as follows:

> [R]eckless conduct may be defined as . . . highly unreasonable . . ., involving not merely simple, or even unexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Franke v. Midwestern Okl. Dev. Auth.*, 428 F.Supp. 719, 725 (W.D.Okl.1976). National Bank argues that the evidence of its involvement, and that of its officer Bell, is not sufficient to support a finding of even negligence, let alone intentional or reckless conduct. The court disagrees and will reserve this issue for determination at trial. The bank raises a connected issue, however, that must be determined prior to trial: whether *respondeat superior* liability is appropriate under Rule 10b–5 in this circuit. The bank argues that the "controlling person" provisions of the 1933 and 1934 Acts have supplanted the doctrine of *respondeat superior* in federal securities cases.[13] As-

---

**13.** Section 15 of the 1933 Act, 15 U.S.C. § 77o, provides:

> Every person who, by or through stock ownership, agency or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person has no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), provides in part:

suming that they have, the bank argues that it meets the "good faith" defense that those provisions provide. Plaintiffs disclaim reliance on these "controlling person" provisions and argue that the familiar principles of agency and *respondeat superior* should apply.

Several circuits have held that the "controlling person" provisions are the exclusive method of imposing secondary liability in securities cases. *See Zweig v. Hearst Corp.,* 521 F.2d 1129, 1132 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *Rochez Brothers v. Rhoades,* 527 F.2d 880, 884–86 (3rd Cir. 1975); *Myzel v. Fields,* 386 F.2d 718, 737–38 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *but see Sharp v. Coopers & Lybrand,* 649 F.2d 175, 180–85 (3rd Cir. 1981) (respondeat superior available in Third Circuit under facts of case). Other circuits, including the Fourth, have taken the position that the principles of agency law complement the "controlling person" provisions. *Marbury Management, Inc. v. Kohn,* 629 F.2d 705 (2d Cir. 1980); *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111 (5th Cir. 1980); *Holloway v. Howerdd,* 536 F.2d 690 (6th Cir. 1976); *Carras v. Burns,* 516 F.2d 251 (4th Cir. 1975); *Fey v. Walston & Co., Inc.,* 493 F.2d 1036 (7th Cir. 1974); *see generally, Annot.* 32 A.L.R.Fed. 714.

 In *Carras v. Burns,* 516 F.2d at 251, the Fourth Circuit held that a broker-dealer's "liability for churning [under Rule 10b–5] would not depend solely on its lack of effective supervision, but would also arise under familiar principles of an employer's vicarious liability." In *Johns Hopkins Univ. v. Hutton,* 422 F.2d 1124, 1130 (4th Cir. 1970), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974), the Fourth Circuit observed that the "controlling person" provision of the 1933 Act "was not intended to insulate a brokerage house from the misdeeds of its employees" and that defendant

would be liable "under familiar principles for the tortious representations of its agent. Restatement (Second) of Agency §§ 257, 258 (1958)."

National Bank, however, relies upon a recent case from the Eastern District of Virginia, *Haynes v. Anderson & Strudwick, Inc.,* 508 F.Supp. 1303 (E.D.Va.1981), in support of its assertion that the "controlling person" provisions are exclusive. That case held that the decision of the Fourth Circuit in *Carpenter v. Harris, Upham & Co., Inc.,* 594 F.2d 388 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979), overruled *sub silentio Carras* and *Johns Hopkins* on the issue of *respondeat superior* liability under Rule 10b–5.

*Carpenter,* however, dealt with an action actually brought under the "controlling person" provisions and not under an agency theory. The reasons for plaintiff's pleading the case in this way may have been the fact that at the time the securities were sold to plaintiffs, the broker whose activities allegedly gave rise to liability was no longer employed by the firm.

> All of the contracts involved in this suit were executed after [the employee] left the firm.

> \* \* \* \* \* \*

> [The firm's] control over [the employee], as well as any duty to supervise his future activities, terminated upon his separation from the firm.

*Carpenter,* 594 F.2d at 393 (emphasis in original). The court rejected the argument that the contracts were part of a continuing series of transactions. *Id.* These statements, however, were not made to show the inapplicability of *respondeat superior*; the court never addressed the issue at all, undoubtedly because the issue was not presented by the case. As stated by the district court in its order granting summary judgment:

Every person who, directly or indirectly, controls any person liable under any provision of this title or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled

person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

I know of no theory that can support a judgment against [the firm] based on actions taken by [its employee] after he left [the firm's] employ.

*Id.* at 390 n.1. Thus the court's discussion of liability under the "controlling person" provisions does not, in this court's view, necessarily imply that it was overruling its clear indication in earlier cases that *respondeat superior* liability may apply in an appropriate case. The action before it clearly was not such a case.

Whatever the merits may be of the dispute between those circuits upholding *respondeat superior* liability and those holding the "controlling person" provisions exclusive, this court feels bound to follow the rule expressed in *Carras* and *Burns*.

 The issues that remain, whether Bell was acting within the scope of his employment with actual or apparent authority and whether it was reasonable for the plaintiffs to so assume from the notice of the appraisals they received either directly from the banks or from the "new issue sheets" of Wyllie & Thornhill, Inc., are factual matters to be resolved at trial. *See Kay Management Co., Inc. v. Creason*, 220 Va. 820, 263 S.E.2d 394 (1980). The general rule is that a principal is liable for the fraud and misrepresentations of his agent while acting within the scope of his authority, even though the principal did not authorize the fraud or could not even be deemed to have knowledge of it. *Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731, 740–41 (10th Cir. 1974).[14] The plaintiffs have produced evidence showing that the appraisals by Bell were on National Bank letterhead, were signed by Bell in his capacity as vice-president of the bank, were typed by a secretary employed by the bank during banking hours, and were referred to by another bank employee as "bank appraisals". O'Neill and Thornhill have testified that they took them to be bank appraisals. Further, Bell had done appraisals for previous O'Neill bond issues not subject to this suit. National Bank, on the other hand, maintains that Bell was acting as an individual in performing the appraisals, was "moonlighting" on his own time, did not tell his supervisors of the appraisals, was not authorized to perform them, and kept all monies received for doing them. These matters, heatedly argued in briefs, are simply not amenable to resolution on a motion for summary judgment. The inferences to be drawn from these facts must be reserved for trial.

## IV. Aiding and Abetting Liability Under Rule 10b–5

Plaintiffs allege in Count IV of their amended complaint that the appraisers and banks, and other third-party defendants, knowingly or recklessly gave substantial assistance to Wyllie & Thornhill, Inc.'s and O'Neill Enterprises, Inc.'s violations of federal securities laws.

██ The classic formulation of aiding and abetting liability is set forth in *S.E.C. v. Coffey*, 493 F.2d 1304 (6th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975):

Without meaning to set forth an inflexible definition of aiding and abetting, we find that a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.

Restatement (Second) of Agency § 257. *See Johns Hopkins Univ. v. Hutton*, 422 F.2d at 1130. Defendant objects that this principle requires reliance on the part of the plaintiff and that plaintiffs are disclaiming such reliance in the 10b–5 action. The court perceives no reason, however, why the presumption of reliance afforded to plaintiffs in their 10b–5 action should not also apply in their vicarious liability action.

---

14. The applicable principles are well-known: A principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is:
 (a) authorized;
 (b) apparently authorized; or
 (c) within the power of the agent to make for the principal.

*Id.* at 1316. This test requires proof of (1) fraud by a primary violator; (2) knowledge of the primary fraud by the alleged aider-abettor; and (3) substantial assistance. *See Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478 (2d Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793 (3rd Cir. 1978); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975); *cf.* Restatement (Second) of Torts § 876.

Plaintiffs have adduced ample evidence to support a finding of primary securities law violations by O'Neill Enterprises, Inc. or Wyllie & Thornhill, Inc. The substantiality of the assistance rendered by the allegedly inflated appraisals cannot seriously be doubted. The issue contested here is again that of the degree of *scienter* necessary to attach liability to the banks and appraisers as aider-abettors.

Actual knowledge of the primary wrong is of course sufficient, *see, e.g., Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080 (S.D.N.Y.1977); plaintiffs have alleged such knowledge in their complaint and inferences from the facts adduced in discovery may support them at trial. The dispute here is whether recklessness, as defined in the preceding section, is sufficient under the facts of this case.

While reckless conduct generally will satisfy the *scienter* requirement of 10b–5, "there are special considerations in applying this general principle to aiders and abettors." *IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir. 1980).

"If all that is required in order to impose liability for aiding and abetting is that illegal activity under the securities laws exists and that a secondary defendant, such as a bank, gave aid to that illegal activity, the act of loaning funds to the market manipulator would clearly fall within that category and would expose the bank to liability for aiding and abetting. Imposition of such liability on banks would virtually make them insurers regarding the conduct of insiders to whom they loan money. If it is assumed that an illegal scheme existed and that the bank's loan or other activity provided assistance to that scheme, some remaining distinguishing factor must be found in order to prevent such automatic liability. The bank's knowledge of the illegal scheme at the time it loaned the money or agreed to loan the money provides that additional factor. Knowledge of wrongful purpose thus becomes a crucial element in aiding and abetting or conspiracy cases."

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975), *quoting from* Ruder, *Multiple Defendants and Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution*, 120 U.Pa.L.Rev. 597, 630–31 (1972). The court in *Woodward* concluded:

When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high "conscious intent" variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter. [Citations omitted]. In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loath to find 10b–5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability.

*Id.* at 97. This duty to disclose may exist "where any person possesses inside information, or where the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case." *Id.* at 97 n.28. Thus where the alleged aider-abettor owed a fiduciary duty to the plaintiff, recklessness satisfied the *scienter* requirement. *IIT v. Cornfeld,*

619 F.2d at 923; *Woodward v. Metro Bank of Dallas*, 522 F.2d at 97; *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d at 1044–45. But where a fiduciary duty does not exist, "[t]he scienter requirement scales upward when activity is more remote; therefore, the assistance rendered should be both substantial and knowing." *Woodward v. Metro Bank of Dallas*, 522 F.2d at 95; *see also Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d at 484–85.

 National Bank argues that the facts of this case require a "high conscious intent" standard of *scienter* for aiding and abetting liability and that no evidence exists to support such a finding. The court is inclined to agree that such evidence is lacking, although inferences from proven facts might support it at trial; but the court does not agree with the premise that recklessness is not sufficient under the facts of this case. The appraisers held themselves out as experts in their field; they received compensation for their services; the appraisals were not "daily grist of the mill" services, such as loaning money, but were extraordinary services provided to an entity that plaintiffs allege was widely known in the Charlottesville financial community to be floating first deed of trust real estate bonds. Further, both banks had loan arrangements with O'Neill Enterprises, Inc. in which financial statements submitted by O'Neill contained values taken from the appraisals made by the bank's appraisers and showed "assets" consisting in large part of appraisal surpluses. National Bank conditioned one of its loans to O'Neill on the assignment to it of the proceeds of Bond issue # 9. Citizens Bank entered into a similar arrangement with O'Neill. Under these allegations, the court is unprepared to hold as a matter of law that *scienter* of the "high conscious intent" variety is required. Recklessness, under the facts to be brought out at trial, may prove sufficient. Accordingly, National Bank's motion for summary judgment on the aiding and abetting count will be denied. Defendant may, of course,

renew the motion by way of motion for a directed verdict at the close of trial.

## V. Aiding and Abetting Liability Under § 12(2)

 Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), provides for civil liability for any person who:

> (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . .

Plaintiffs plead this section as an alternate theory of liability. The bank argues that it is not an "offeror or seller" of a security within the meaning of § 12(2). Plaintiffs, however, have represented to the court that what they have actually alleged, and what they intend to prove, is that the banks and their appraisers aided and abetted the § 12(2) violations of Wyllie & Thornhill, Inc.[15] This theory of liability is an accepted one, the elements of which apparently are the same as those of aiding and abetting under Rule 10b–5. What is required is that "the aider and abettor be aware of the violation or act recklessly in that regard and give assistance to the primary wrongdoers. It is the participation with the knowledge that a fraud is being committed that leads to liability." *Stern v. American Bankshares Corp.*, 429 F.Supp. 818, 824 (E.D.Wis.1977). *See also Pharo v. Smith*, 621 F.2d 656 (5th Cir. 1980); *Securities & Exchange Commission v. Murphy*, 626 F.2d 633 (9th Cir. 1980); *In re Itel Securities Litigation*, 89 F.R.D. 104 (N.D.Cal.1981); *Sandusky Land, Ltd. v. Uniplan Groups, Inc.*, 400 F.Supp. 440 (N.D.Ohio 1975); *In re Caesars Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y.1973).

 Whether the defendants' participation in the alleged scheme to defraud is sufficient for § 12(2) aider-abettor liability

---

**15.** Plaintiffs' Memorandum in Opposition to Third-Party Defendants' Motions Regarding

§ 12(2), p. 4.

is again a question that must be reserved for trial.

## VI. *Conclusion*

The court has dealt here only with those issues it perceived necessary to prepare this case for trial. The case is replete with factual issues that are inappropriate to resolve on a motion for summary judgment, and the motion of National Bank is accordingly denied. Should the defendants feel that other issues require resolution prior to trial, and involve issues only of law, they are invited to present them to the court by appropriate motion.