**Stanley V. GROSSMAN, et al., Plaintiffs,**

v.

**WASTE MANAGEMENT, INC., et al., Defendants.**

**No. 83 C 2167.**

United States District Court, N.D. Illinois, E.D.

June 14, 1984.

---

‎

Ronald Futterman, Hartunian, Futterman & Howard, Chicago, Ill., Klari Neuwelt, Wolf Popper Ross Wolf & Jones, Sharon Levine Mirsky, Milberg, Weiss, Bershad, Spechtrie & Learch, New York City, Herbert J. Milstein, Steven J. Toll, Patricia Bak, Kohn, Milstein, Cohen & Hausfeld, Washington, D.C., for plaintiffs.

Francis J. Higgins, William R. Carney, John W. Rotunno, Bell, Boyd & Lloyd, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

Before the court are defendants' motions for summary judgment as to each of the three named plaintiffs in this securities fraud action. On February 6, 1984, we certified a class of plaintiffs on the claims contained in the complaint under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982). *Grossman v. Waste*

*Management, Inc.*, 100 F.R.D. 781 (N.D.Ill. 1984). We also indicated that we would certify a class on plaintiffs' claims under § 11 of the Securities Act of 1933, 15 U.S.C. § 77k (1982) once plaintiffs demonstrated that arrangements had been made for the payment of the cost of notice to the § 11 class. *Id.* Plaintiffs made such a showing, and we certified a § 11 class. Defendants now urge that they are entitled to summary judgment as to each of the named plaintiffs, Stanley Grossman, Cathy Chester, and Kenneth Frohlick. The motions have been briefed extensively, and each side has filed voluminous evidentiary materials in support of its positions. We will begin with the § 10(b) claims and thereafter discuss the § 11 claims.

# I

## SECTION 10(b) CLAIMS

Plaintiffs' § 10(b) claims are predicated on their allegation that defendants Waste Management, Inc. ("Waste Management") and several of its managing officers misrepresented or withheld information concerning the company's compliance with environmental regulations and disputes with regulatory authorities. Plaintiffs allege that defendants engaged in a course of conduct designed to deceive the public as to these matters, beginning with the issuance of Waste Management's 1981 annual report on March 31, 1982. Included in the course of conduct was an allegedly misleading prospectus issued in connection with a proposed merger between Waste Management and Chem-Nuclear, Inc. ("Chem-Nuclear"), a merger that was consummated in October 1982. In March 1983 the information allegedly withheld became public, and the price of Waste Management's stock dropped considerably.

Plaintiffs Stanley Grossman and Kenneth Frohlick both purchased Waste Management stock after receiving "buy" recommendations from an investment adviso-

ry service in February 1983. They represent the § 10(b) class. Plaintiff Cathy Chester acquired her Waste Management stock in connection with the merger with Chem-Nuclear; she was a Chem-Nuclear shareholder who tendered her stock in exchange for Waste Management stock. Though Chester has pleaded claims under § 10(b), we ruled in our February 6 decision that she was not a proper representative of the § 10(b) class because she was subject to a unique defense to which the class might not be subject. However, Chester does represent the § 11 class, which is made up of those persons who acquired Waste Management stock in connection with the Chem-Nuclear merger and who sustained damages as a result thereof. The § 11 claim stems from the allegedly misleading prospectus issued to Chem-Nuclear shareholders in connection with the proposed merger.

### A. *Introduction.*

As we noted in our decision certifying the § 10(b) class, the primary legal theory upon which plaintiffs base their § 10(b) claims is that defendants' conduct amounted to a "fraud on the market" that resulted in the inflation of the price of Waste Management stock. In the present motions, defendants argue that we should not accept the fraud on the market theory as providing a basis for relief under § 10(b) and SEC rule 10b–5, and that in any event defendants have shown that plaintiffs are not entitled to the benefit of that theory under the facts of this case. We will first discuss the general principles that govern our consideration of defendants' motions and then will address each named plaintiff's claim separately.

In addition, defendants urge that their disclosures were adequate, at least in certain respects; they therefore ask that we find in their favor as to certain of plaintiffs' allegations, pursuant to Fed.R.Civ.P. 56(d).[1] We will address that question after dealing with the named plaintiffs' claims.

---

**1.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court

at the hearing of the motion, by examining the pleadings and the evidence before it and interrogating counsel, shall if practicable

In a typical 10b–5 action in which the plaintiff asserts that the defendant made misrepresentations, the plaintiff bears the burden of persuasion as to several factors as prerequisites to recovery:

1) that he purchased or sold securities, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975);

2) that the defendant misrepresented facts either with an intent to deceive, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), or with a reckless disregard for the truth, *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1043–45 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977);

3) that the defendant's misrepresentations were material, *Sundstrand*, 553 F.2d at 1040 (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 440, 96 S.Ct. 2126, 2128, 48 L.Ed.2d 757 (1976));

4) that the plaintiff relied upon the misrepresentations, *id.*; and

5) that the plaintiff's reliance was justifiable in the sense that plaintiff did not disregard a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. *Id.* at 1048 (citing with approval *Holdsworth v. Strong*, 545 F.2d 687, 693 (10th Cir.1976) (en banc)); *Dupuy v. Dupuy*, 551 F.2d 1005, 1017–20 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).

The courts have also recognized that materiality, reliance, and the justifiability of the reliance are all elements of the plaintiff's burden of showing causation. *See, e.g., Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (materiality and reliance are elements of causation); *Bell v. Camer-on Meadows Land Co.*, 669 F.2d 1278, 1283 (9th Cir.1982) (reliance is normally shown in order to demonstrate the causal connection between a defendant's wrongdoing and a plaintiff's loss); *Holdsworth*, 545 F.2d at 694 (viewing justifiability of reliance as element of causation). *See generally* R. Crane, "An Analysis of Causation under Rule 10b–5," 9 Sec.Reg.L.J. 99, 101 (1981).

In *Affiliated Ute Citizens v. United States*, the Court held that in a 10b–5 case involving primarily a failure to disclose, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153, 92 S.Ct. at 1472. In such a case what must be shown to establish that defendant's conduct was the cause of plaintiff's purchase is that "the facts withheld [are] material in the sense that a reasonable investor might have considered them important in the making of [his] decision." *Id.* at 153–54, 92 S.Ct. at 1472–73. The courts have also held, as in the case of misrepresentations, that if plaintiff's failure to discover the truth was the result of his own reckless or conscious disregard of information available to him, his right to recover is defeated. *Sundstrand*, 553 F.2d at 1048. However, since under *Affiliated Ute* reliance is essentially "presumed" to exist in an omissions case if the omission is material, the defendant bears the burden of showing that the plaintiff's non-discovery was attributable to his own conduct. *Id.*

In addition, most courts have held that the *Affiliated Ute* presumption of reliance may be rebutted in other ways. If, for example, the defendant can prove that the plaintiff's decision to buy or sell would have been the same even had he known the truth, it has rebutted the presumption of reliance. *See, e.g., Bell v. Cameron Meadows Land Co.*, 669 F.2d at 1283. Some courts have expressed this in a slightly different way: if defendant can show that

ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established and the trial shall be conducted accordingly.

Fed.R.Civ.P. 56(d).

plaintiff's decision would not have been affected if defendant had disclosed the omitted facts, then recovery is barred. *See, e.g., Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1519–20 (10th Cir.1983); *Rifkin v. Crow*, 574 F.2d 256, 262 (5th Cir.1978). For example, proof that the plaintiff did not read the publication in which the omissions occurred has been held sufficient to rebut the presumption of reliance. *Zobrist*, 708 F.2d at 1519–20; *Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir.1981) (en banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983).

*Affiliated Ute*'s presumption of reliance is based on the practical impossibility of proving reliance in a case where no allegedly false statements have been made. *See Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 93 (2d Cir.1981). *See also* Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 Harv.L.Rev. 584, 590 (1975). However, where the omissions that form the basis for plaintiff's claim are contained in a particular disclosure (such as a prospectus or offering circular), it has been held that the plaintiff cannot recover if he never read or knew of the disclosure, for in such a case the omissions cannot have been a cause of his purchase of the security. *Wilson*, 648 F.2d at 93–94; *see* R. Crane, *supra* at 106.

B. *Fraud on the Market*

Some courts have extended the *Affiliated Ute* presumption of reliance to cases in which, unlike *Affiliated Ute*, there is no direct contact between the plaintiff and the person making the alleged misrepresentations or omitting to disclose material facts. One such situation is the "fraud on the market" theory on which plaintiffs rely. Under *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), the seminal case concerning fraud on the market, an open market purchaser of a security for which there is a developed market may maintain a cause of action by alleging that he purchased stock the price of which was inflated due to defendant's fraud. Under this theory, "a plaintiff ... need not allege

individual reliance but only that the plaintiff relied upon the integrity of the market price of the security which was distorted by the impact of the particular misstatements." *In re LTV Securities Litigation*, 88 F.R.D. 134, 142 (N.D.Tex.1980). The rationale for extending the presumption of reliance to such a case was explained in *Blackie v. Barrack:*

> A purchaser on the stock exchanges ... relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price—whether he is aware of it or not, the price he pays reflects material misrepresentations. Requiring direct proof from each purchaser that he relied on a particular representation would defeat recovery by those whose reliance was indirect, despite the fact that the causational chain is broken only if the purchaser would have purchased the stock even had he known of the misrepresentation.

*Blackie*, 524 F.2d at 907. According to the court in *LTV*,

> [t]he presumption can be considered as recognition of the market's role as a transmission belt linking the misrepresentation and the individual purchaser or seller .... In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by the investor. With the presence of a market, the market is interposed between seller and buyer, and ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

*LTV*, 88 F.R.D. at 143.

The Seventh Circuit has not addressed the validity of the fraud on the market

theory. In our opinion granting plaintiffs' motion for class certification, we assumed without deciding that the theory was valid. *Grossman v. Waste Management, Inc.,* 100 F.R.D. 781, 787 & n. 4 (N.D.Ill.1984). Defendants urge that we now decline to adopt the theory.

At least one other court of appeals had approved of *Blackie.* In *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *vacated as moot,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982), the Second Circuit, noting that "[p]roving reliance is difficult where the fraud has affected the market and damaged the plaintiff only through its effect on the market," *id.* at 368, the court approved of *Blackie* and indeed extended it to one whose reliance on the market is only indirect, as will be seen *infra. See also Ross v. A.H. Robins Co.,* 607 F.2d 545, 553 (2d Cir.1979) (implicitly approving *Blackie* ), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). In addition, the *Blackie* theory has been expressly or implicitly accepted by most of the district courts considering it. *See, e.g., Beebe v. Pacific Realty Trust,* 99 F.R.D. 60, 68 (D.Ore.1983); *HSL, Inc. v. Daniels,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,557 at 97,-197–98 (N.D.Ill.1983) (Roszkowski, J.); *Schlanger v. Four-Phase Systems, Inc.,* 555 F.Supp. 535, 537–38 (S.D.N.Y.1982); *McNichols v. Loeb Rhoades & Co.,* 97 F.R.D. 331, 336 (N.D.Ill.1982) (Getzendanner, J.); *Mottoros v. Abrams,* 524 F.Supp. 254, 258–60 (N.D.Ill.1981) (Grady, J.); *Pellman v. Cinerama, Inc.,* 89 F.R.D. 386, 388 (S.D.N.Y.1981); *Wolgin v. Magic Marker Corp.,* 82 F.R.D. 168, 174 (E.D.Pa.1979); *Lewis v. Capital Mortgage Investments,* 78 F.R.D. 295, 308–09 (D.Md.1977); *Sargent v. Genesco, Inc.,* 75 F.R.D. 79, 85 (M.D.Fla.1977).

Defendants argue that two courts of appeal have declined to adopt *Blackie* when faced with circumstances that might have occasioned its adoption. In *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied,* 455 U.S. 936, 102 S.Ct. 1424, 71 L.Ed.2d 646 (1982), the court addressed a 10b–5 claim concerning securities that plaintiff had purchased in connection with an initial offering. Plaintiff alleged in part that defendants had engaged in a scheme to create a bond issue that would appear genuine but that was so deficient that it never would have been approved for issuance absent the scheme to defraud. The court reversed the district court's dismissal of the complaint, stating that "[t]he requisite element of causation in fact would be established if [plaintiff] proved the scheme was intended to and did bring the bonds onto the market fraudulently and proved he relied on the integrity of the offerings of the securities market." *Id.* at 469. The court went on to state that 10b–5 misrepresentation cases requiring reliance on the document making the misrepresentation "are inapposite to a case in which the buyer relied on the integrity of the market to furnish securities which were not the product of a fraudulent scheme." *Id.* at 471. In support of that assertion, the court cited *Blackie. Id.* at 471 n. 11.

We view *Shores* as an extension of *Blackie* to a case in which no developed market for the security existed. In the case of shares of stock for which a developed market exists, the investor under the *Blackie* theory relies on the supposition that the price of the stock has not been affected by fraudulent misrepresentations or omissions. In a case under the *Shores* theory, since no market as such exists, the investor relies on the fact that the securities would not have been offered absent the scheme to defraud—in other words, upon the integrity of the market itself, rather than the integrity of market's price. Rather than rejecting or limiting *Blackie,* the *Shores* court's implicit reliance upon the case in footnote 11 implied acceptance of the *Blackie* doctrine. *See Lipton v. Documentation, Inc.,* [Current] Fed.Sec.L. Rep. (CCH) ¶ 98,788 at 94,042 (M.D.Fla. 1982) (reading *Shores* as an extension of *Blackie* ).

Nor does *T.J. Raney & Sons, Inc. v. Fort Cobb Irrigation Fuel Authority,* 717 F.2d 1330 (10th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984) suggest a limitation or rejection of *Blackie.*

*T.J. Raney* was a case much like *Shores* in that it involved alleged fraud in the issuance of bonds. The court followed *Shores*, stating that "regulation of new securities at a minimum should permit a purchaser to assume that the securities were lawfully issued." *Id.* 104. S.Ct. at 1333. The court noted that the courts that had accepted "some form of fraud on the market theory" had dealt with securities traded on "impersonal, actively traded markets," implying that what it adopted to address the situation of a newly-issued security was simply another "form" of the theory. *Id.* at 1332. Like *Shores*, *T.J. Raney* extends the *Blackie* theory to a situation different from that involved in *Blackie.*

The fraud on the market theory, as applied to a developed securities market, assumes that the market price of stock reflects all available public information, including material misrepresentations. As discussed at length in *LTV*, 88 F.R.D. at 144–45, economic studies tend to support this assumption. In addition, the policies of the securities law supports adoption of the fraud on the market approach. As defendants themselves suggest, one central purpose of the 1933 and 1934 acts is full disclosure. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–78, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977); *LTV*, 88 F.R.D. at 145. Notwithstanding defendants' arguments to the contrary, we think that the *Blackie* theory promotes that goal in that if full disclosure is made by an issuer of securities, that information is, under the "efficient market" theory that underlies *Blackie*, absorbed by the market, and recovery by an open market purchaser is unavailable. That *Blackie* may tend to put more of a premium on full disclosure by an issuer does not make it antithetical to the goals of the securities laws.[2]

■ We also reject defendants' suggestion that adoption of the fraud on the market theory is tantamount to establishment of a scheme of investor insurance. First, the Supreme Court itself has noted that the 1933 and 1934 acts were aimed "to protect investors against fraud and ... to promote ethical standards of honesty and fair dealing. *Ernst & Ernst v. Hochfelder*, 425 U.S. at 195, 96 S.Ct. at 1382 (citing H.R. Rep. No. 85, 73d Cong., 1st Sess. 1–5 (1933)). "The basic intent of section 10(b) and rule 10b–5 ... is to protect investors and instill confidence in the securities markets by penalizing unfair dealings." *Shores*, 647 F.2d at 470 (quoting *Sargent v. Genesco, Inc.*, 492 F.2d 750, 760 (5th Cir. 1974)). *See also Sundstrand*, 553 F.2d at 1050 ("the ultimate goal of securities regulation is to achieve fundamental fairness in the marketplace .... [T]he focus is on controlling practices which smack of fraud."); *Sargent v. Genesco, Inc.*, 75 F.R.D. at 84 (one purpose of the 1934 act is to "achiev[e] a high standard of integrity in the securities industry"). In addition, the fraud on the market theory does not excuse a 10b–5 plaintiff from showing that the defendant intentionally or recklessly made misstatements or omissions of fact that were material, and that plaintiff purchased or sold securities the price of which was inflated by the misrepresentations.

■ For these reasons, we hold that the fraud on the market theory of recovery, as described in *Blackie v. Barrack*, is a viable means of proving liability in a 10b–5 action.

### C. *Reliance on Factors Other Than the Market*

Defendants next argue that the plaintiffs here are not entitled to the benefit of the *Blackie* theory. We will discuss the particular facts of each named plaintiff's case

---

**2.** We also disagree with the court in *Fausett v. American Resources Management Corp.*, 542 F.Supp. 1234, 1238 (D.Utah 1982), which rejected the fraud on the market theory because it would permit one to recover who did not read and rely on the defendant's disclosures. If plaintiffs' allegations are true, it would have done them no good to read defendants' disclosures to the SEC, because those disclosures did not paint a true or full picture of Waste Management's problems. If plaintiffs' claims are true, the defendants' paeans to the god of "full disclosure" are somewhat hypocritical.

*infra* at 407–414. For the present, we will confine ourselves to a discussion of defendants' argument that where a plaintiff is shown to have relied in purchasing securities on factors other than the market, the *Blackie* presumption of reliance should be considered rebutted.

In our opinion granting plaintiffs' motion for class certification, we noted that "proof that the plaintiff relied on factors extraneous to the market may serve to rebut the presumption of reliance." *Grossman v. Waste Management, Inc.*, 100 F.R.D. at 788. We also noted, however, that if a plaintiff relied on the statements of third parties who reiterated, digested, or reflected defendants' misstatements, he has not relied on factors wholly extraneous to the market. *Id.* Of course, at that time we were not passing on the merits of plaintiffs' claims. Therefore, we do not regard our prior statements as controlling in the present context.

*Blackie* identified two ways in which a defendant might disprove causation: 1) by disproving materiality or by showing that an insufficient number of traders relied to inflate the stock's price, or 2) by proving that an individual plaintiff purchased despite knowledge of the falsity of defendant's representations, or that he would have, had he known of it. *Blackie*, 524 F.2d at 906. "Reliance on other factors," though it relates somewhat to method 2), does not fit neatly under the scheme outlined in *Blackie*, for it does not fully address the issue whether the misrepresented or undisclosed information would have made any difference to the plaintiff. For example, one who relies on a stockbroker's recommendation in purchasing a particular stock might lose under defendant's theory, but he might win under *Blackie*, since it is still possible that he would not have purchased the stock had he known the truth. Thus, what defendants ask us to do is to limit *Blackie*.

The theoretical underpinning of *Blackie* is that a typical investor relies on the integrity of the market, with the emphasis on "integrity." Defendants' suggestion that what is required is reliance on "price" or "the market," besides being rather difficult to understand, is incorrect. As stated in *Blackie*, the typical investor "relies ... on the supposition that the market price is *validly* set" and that it has not been inflated by manipulation. *Id.* at 907 (emphasis supplied). In order to rebut the presumption of reliance that is based on that proposition, a defendant would, as one might expect, be required to adduce evidence directed at showing that the underlying proposition does not apply in the particular case. That is why *Blackie* expressed the defendant's burden in terms of showing that the plaintiff bought despite knowledge of the defendant's fraud or would have bought even had he known of the fraud. Though, as *Blackie* noted, this is a rather difficult burden to meet, *id.* at 906–07 n. 22, a defendant might help his own cause (though not necessarily establish it) by showing that the particular investor always does what his broker recommends, no matter what stock is involved.

Some courts have, however, stated that the presumption of reliance in a fraud on the market case may be rebutted in another way, by showing that the defendant relied on non-market factors in making the particular purchase. For example, in *LTV* the court stated that the presumption could be rebutted by showing that the investor relied "upon factors extraneous to the market." *LTV*, 88 F.R.D. at 143–44. This is illustrated by cases in which non-market factors played the primary role in the plaintiff's decision to purchase. *E.g.*, *Markewich v. Ersek*, 98 F.R.D. 9, 10–11 (S.D.N.Y. 1982) (reliance on recommendation of broker who had "inside" information); *McNichols v. Loeb Rhoades & Co.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,463 at 96,645–49 (reliance on misrepresentations by one allegedly part of scheme to defraud); *Greenspan v. Brassler*, 78 F.R.D. 130, 132–33 (S.D.N.Y.1978) (reliance on recommendation of plaintiffs' brother, a professional investor who based recommendation on generalized faith in the type of investment in question, real estate investment trusts).

Similarly, in *Beissinger v. Rockwood Computer Corp.*, 529 F.Supp. 770 (E.D.Pa. 1981), the plaintiffs relied on the recommendation of the comptroller of a client of the accounting firm of one of the plaintiffs. The court first held that plaintiffs had failed to show the existence of a "comprehensive" scheme to defraud, and thus they could not rely on the fraud on the market theory. *Id.* at 786. The court went on to state that any presumption of reliance had been rebutted, because the plaintiffs had relied on the comptroller and not on the integrity of the market price of the stock. *Id.* at 786–87.[3]

It is possible to reconcile these cases, and others like them, with the *Blackie* theory. In each case it appeared that the plaintiff was essentially indifferent to any factor other than the recommendation he received, since the decision to purchase the securities was based entirely on the recommendation of a third party. Moreover, in each case there was nothing to suggest that the recommendation had any basis in a belief in the integrity of the market price of the security. Thus, the plaintiff's decision to buy was based on factors wholly extraneous to the integrity of the market.

Defendants in the present case argue that where an investor relies on the recommendation of an investment analyst, he is actually relying on something other than the integrity or "correctness" of the market price of the stock. According to defendants, the essence of an analyst's recommendation to buy a stock is that the market price of the stock is incorrect, i.e., the stock is priced at less than its true value. That may well be one reason why a broker makes a particular recommendation; however, other possible reasons exist. For example, the broker may base his recommendation not on the present "invalidity" of the price but rather on his or someone else's projection of future trends in the market in which the company operates. Or

the analyst may believe that he reacts more quickly than does the market to information that has become available; in other words, the analyst's recommendation is made so that his client can purchase the stock before the market reacts favorably to late-breaking information. In either case, the analyst may (and likely does) still rely on the supposition that the price of the stock has not been inflated by a scheme to defraud. Moreover, even where the analyst believes, as defendants suggest, that the market price of a stock is "wrong," that is not the same as nonreliance on the assumption that the price has not been artificially inflated by fraud. Thus, even if defendants are correct in their assertion, an investor's reliance on an analyst's recommendation does not totally divorce the investor's decision to purchase from basic reliance on the *integrity* of the market price of the stock, for unlike the persons who made the recommendations in *Markewich* and the other cases discussed above, the investment analyst may be presumed to have based his recommendation on factors not wholly divorced from the market.

■ A strict application of *Blackie* would dictate that a plaintiff's reliance on an investment advisor's recommendation would not be a defense, for the basic issue would still be whether the plaintiff would have purchased had he known of defendant's fraud. *Markewich, Beissinger,* and the other cases discussed above implicitly shift the focus to the third party on whom the investor relied. This is, in our view, an appropriate shift. In a case in which the plaintiff has based his decision to purchase entirely on the recommendation of another, it is unrealistic to look at the importance knowledge of defendant's fraud may have had to plaintiff, since the "analysis" that underlies plaintiff's purchase was made by a third party. However, simply to state that an investor relied on a broker's recom-

---

**3.** The court also stated that the presumption of reliance was rebutted because plaintiffs had not read the annual report which they asserted gave rise to the fraud on the market. We read this holding as relating not to plaintiff's fraud on the market theory but to the presumption of reliance that was raised under their *Affiliated Ute* "omissions" theory, which plaintiffs had advanced as an alternative theory of recovery. *Id.* at 786–87.

mendation is not in our view sufficient to rebut the presumption of causation under the fraud on the market theory, for the reasons we have stated. In order to rebut that presumption in such a case, a defendant must show that the decision to purchase was based on factors "wholly extraneous to the market." Absent some evidence showing that the broker or analyst's recommendation was based on such factors, we cannot say that the investor's decision to purchase was divorced from basic reliance on the integrity of the market price of the stock.[4]

Defendants' suggestion that reliance on an analyst's recommendation is sufficient in and of itself to rebut the presumption of causation, besides its inconsistency with the theoretical underpinnings of the fraud on the market theory, undoubtedly would exclude from the class of eligible plaintiffs many of those whom the fraud on the market theory was intended to compensate.

**4.** To the extent that shifting the focus to a third party on whose recommendation a decision to buy was made amounts to adoption of a theory of indirect causation, it is supported by *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *vacated as moot,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982), and several other cases following a similar theory. In *Panzirer* plaintiff purchased stock after reading a Wall Street Journal column reporting that several analysts believed that a company had bright prospects in the video cassette tape market. Defendants were granted summary judgment because plaintiff had relied primarily on the article. Plaintiff argued on appeal that the article would not have contained favorable mention of the company if the company's annual report, which plaintiff claimed misrepresented the company's financial state, had been accurate. The court noted that defendants had offered no evidence to rebut the chain of causation, and it therefore reversed, stating that a claim that plaintiff acted upon information from those working in the securities markets that was circulated after a material misrepresentation or omission was legally sufficient to show "reliance" on the misrepresentation. *See also In re Ramada Inns Securities Litigation,* 550 F.Supp. 1127, 1131 (D.Del.1982) (purchase in reliance on recommendation of investment advisor whose advice was based on corporate management's misreporting); *Frankel v. Wyllie & Thornhill, Inc.,* 537 F.Supp. 730, 738 (W.D.Va.1982) (reliance on prospectuses based in part on fraudulent property appraisals sufficient to support claim against appraisers, since

*See* Note, "The Fraud on the Market Theory," 95 Harv.L.Rev. 1142, 1150 n. 32 (1983). The parties have offered no evidence as to the percentage of investors who rely on the recommendation of analysts, advisors, or brokers in purchasing securities, either in the case of Waste Management or generally, but it is not unreasonable to suppose that the number if quite large.

Though it is true that the rule we adopt might have the effect of substantially broadening the inquiry in an already-complex lawsuit, *see* D. Goldwasser & L. Wasserman, "Fraud on the Market," 16 Rev. Sec.Reg. 141, 153 (1983), we think it more consistent with *Blackie* and the underlying purpose of the securities laws to protect investors and the integrity of the securities markets.

Having determined the law that applies in this case, we turn to the facts relating to the individual plaintiffs' claims.

appraisers reasonably could expect such reliance); *Walsh v. Butcher & Sherrerd,* 452 F.Supp. 80, 84 (E.D.Pa.1978) (plaintiff purchased on recommendation by broker based on representations of brokerage firm's senior partner; plaintiff can maintain claim against firm.)

Of these cases, only *Panzirer* arguably concerned the fraud on the market theory. However, the basic idea of "indirect causation" is one that appropriately applies here, as defendants reasonably could expect that any fraud they committed upon the securities markets would filter through securities analysts to eventual purchasers of stock.

We also note that this case is a much stronger one for application of this theory than is *Panzirer.* In that case there was no suggestion that the analysts had relied on the integrity of market price; rather, the theory was that they would not have concluded that the company's prospects in a particular market were bright had they been aware of the company's overall financial condition. That is a much more attenuated theory of causation than that asserted here.

Finally, this case is not like *Sundstrand,* 553 F.2d at 1051, in which the court held that defendants could not be held liable for a payment for certain shares of stock, because the payment was made in reliance on incorrect legal advice that it had to be made. In that case the intervening factor was a superseding cause wholly independent of defendant's fraud. The same cannot be said of a broker's recommendation, absent additional evidence of the type described above.

### D. *Grossman*

■ Grossman received a telephone recommendation to purchase Waste Management stock from an investment analyst named Zweig in mid-February 1983. He purchased the stock either the same day or in the two days following the day he received the recommendation. All he recalls about the recommendation was the suggestion to buy; Zweig's recommendations, Grossman stated, are typically rather terse. Grossman was asked if he knew how Zweig arrives at his recommendations. He responded that he had signed an agreement when he subscribed to Zweig's service not to reveal any of Zweig's strategies. Grossman Deposition at 29. It appears that though Grossman knows certain of Zweig's "fundamentals," he does not know the factors Zweig relied upon with respect to Waste Management. *Id.* at 73.

After receiving the Zweig recommendation, Grossman looked up Waste Management in Standard & Poor's, a publication that provides financial and other information on publicly traded companies. He does not recall exactly what he read in Standard & Poor's, but in general he remembers that it identified the company's general business as waste management, stated that the company was doing well, and indicated that management was "sanguine" about future prospects. *Id.* at 39. Grossman does not still have the particular pages in Standard & Poor's that he reviewed; the publication is a loose-leaf service, and the pages then current have been replaced. *Id.* at 40. Grossman also stated that there was nothing in Standard & Poor's indicating adverse news about Waste Management. *Id.* at 42.

Grossman did not ask his stockbroker or anyone else for any of Waste Management's reports before placing his order to purchase the stock. He testified that the reason he did not do this was that he "pay[s] Mr. Zweig for his expertise. I do not want to have too much second-guessing." *Id.* at 57–58. Grossman assumes that if Waste Management had revealed that it had seriously violated the environ-

mental laws, that fact would have been significant enough to be reported in Standard & Poor's. *Id.* at 62, 64–65. There is no evidence now before us indicating what was actually reported in the pages of Standard & Poor's that Grossman reviewed.

On the basis of the above information, we cannot say that Grossman's decision to purchase was entirely divorced from the market. We remind defendants that they bear the burden of rebutting the presumption of causation under *Blackie;* thus, the absence of evidence relating to Zweig and Standard & Poor's works against defendants, not plaintiffs. On the present record, though it would be possible for the trier of fact at trial to decide that Grossman's decision to purchase was based completely on Zweig's recommendation, we cannot say that that recommendation was not based on a basic reliance on the integrity of the market price of the stock. Nor can we say that Zweig was aware of what defendants claim are the public facts concerning their alleged problems with the regulatory authorities. *See supra* at 404. Therefore, summary judgment in favor of defendants and against Grossman would not be appropriate on the present record.

### E. *Frohlick*

■ Frohlick also subscribes to Zweig's service, and the initial factor in his decision to purchase Waste Management stock was Zweig's recommendation. He had not heard of Waste Management before receiving the recommendation, and he purchased the stock on the same day he received the recommendation, or on the following day. Frohlick Deposition at 42–46. He does not know the basis for Zweig's recommendation, either in general or in the case of Waste Management. *Id.* at 41–42.

After receiving Zweig's recommendation, Frohlick consulted two publications produced by an investment advisory service called Value Line. *Id.* at 47–49, 69–70, 283–86. The documents identified at Frohlick's deposition, *see* Frohlick Dep. Ex. 2 at 21, Ex. 3 at 363, give various financial data and rank the company's stock for "safety" and "timeliness," defined as projected perform-

ance for the coming twelve months. Waste Management was ranked average for safety and above average for timeliness. Frohlick testified that he focused primarily on the financial data provided by Value Line. Frohlick Dep. at 73. One of the documents gave a narrative forecast of the performance of the company in 1983, including some "question marks." The only "question marks" identified related to delays in several hazardous waste burns due to delays in approval of operating permits for ocean incineration vessels, and contracts for projects in Argentina that might be affected by a devaluation of that country's currency. Ex. 3 at 363. Frohlick testified that these matters made little difference to him. Frohlick Dep. at 74–76.

Frohlick also testified that had he been aware that the company had been fined for environmental violations, he would not have invested in the company's stock. *Id.* at 124–29. The same would be true had Frohlick been aware that the company was engaged in illegal handling of hazardous waste. *Id.* at 126. Finally, he testified that he would not have purchased the stock had he been aware that the company was involved in litigation that could result in the imposition of a fine for an environmental violation. *Id.* at 129.

As with Grossman, we cannot say on the present record that Frohlick's decision to buy was based on factors wholly extraneous to the market. However, defendants argue that in light of Frohlick's testimony that he would not have purchased the stock had he been aware of fines against Waste Management for environmental noncompliance or of litigation that could result in such fines, he should not be entitled to recover, since Waste Management had publicly disclosed such matters in filings with the Securities Exchange Commission ("SEC").

We need not decide whether this would be a viable defense to a fraud on the market claim, for defendants' materials do not establish the factual predicate for the defense. Defendants rely on two statements contained in SEC filings. The first was contained in a "10–K" form for the fiscal year 1981:

> The Company is a party to several environmental protection proceedings instituted by federal, state or local authorities, which, at December 31, 1981, included two proceedings alleging noncompliance with regulatory requirements regarding waste disposal facilities.

The second was contained in the same 10–K:

> The chemical waste services performed by the Company expose it to risks, in kind and degree, not associated with its solid waste management operations, such as the potential for chemical substances escaping into the environment and causing hazards or injuries which could be substantial. In addition, at such time as the Company may be required to monitor and maintain closed solid or chemical landfill sites, or to undertake corrective measures at operating or closed disposal sites, the costs could be substantial.

Any suggestion that the second statement disclosed the existence of fines against the company or litigation that could lead to the imposition of fines, or that it indicates that the company was disposing of wastes illegally, is at best laughable. The statement is simply a general description of the risks that the company believes attend even proper disposal, and it does not even mention litigation or fines. The first statement does mention "environmental protection proceedings," but it does not say that they are lawsuits or that fines might result from them. It is not apparent from a statement that a "proceeding" exists concerning "noncompliance with regulatory requirements" that the company was disposing of hazardous wastes illegally or that fines could be imposed upon the company. It is possible, for instance, that one could read the first statement as referring merely to matters of technical or formal noncompliance. Thus, even if the company's defense is a viable one, it has not established the factual basis needed to prove it. Defendants' motion for summary judgment

as to Frohlick's fraud on the market claim is therefore denied.

### F. *Grossman and Frohlick—"omissions" claims*

■ Grossman and Frohlick also argue that they are entitled to recover under an *Affiliated Ute* "omissions" theory. Cases under 10b–5 have established that nondisclosure violates the law only where an affirmative duty to disclose exists. *See Chiarella v. United States*, 445 U.S. 222, 228–30, 100 S.Ct. 1108, 1114–16, 63 L.Ed.2d 348 (1980). This may arise from a relationship between the parties or from the defendant's status. For example, a corporate insider with material inside information must disclose it or abstain from trading in the company's securities. *Id.* at 228–29, 100 S.Ct. at 1114–15. By contrast, an ordinary purchaser or seller of stock has no such duty. *Id.* at 229, 100 S.Ct. at 1115. *Affiliated Ute*, as construed in *Chiarella*, illustrates a case in which the defendant's status gives rise to a duty to disclose. In *Ute* a corporation issued stock to its shareholders and designated a bank as transfer agent for the stock. It asked the bank to stress to the shareholders the importance of retaining the stock, due to the difficulty in determining its value. Two bank employees aided the shareholders in disposing of their stock, which the employees knew was traded on two markets. They did not advise the shareholders of the existence of the market on which their stock would have obtained a higher selling price. *Affiliated Ute*, 406 U.S. at 152–53, 92 S.Ct. at 1471–72. In *Chiarella* the Court noted that the duty to disclose in *Ute* arose from the corporation's instructions to the bank.

■ In addition, a duty to disclose may arise from having chosen to speak. If, for example, a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth. *See, e.g., First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). *See generally* R. Crane, "An Analysis of Cau-

sation Under Rule 10b–5," 9 Sec.Reg.L.J. 99, 104 & n. 17 (1981) (citing cases).

Defendants argue that the presumption of reliance established in *Affiliated Ute* should apply only to cases of "pure nondisclosure" and not to cases of omissions in documents issued by a defendant. The latter type of case, defendants urge, is best viewed as similar to a case involving misrepresentations. In *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713 (8th Cir.1978), the court accepted a similar argument. There the plaintiff attempted to cast his case as one involving primarily nondisclosure. In examining the complaint, the court noted that the allegations concerned alleged misrepresentations and omissions in two specific documents. Moreover, the specific allegations of the complaint stated that the documents contained misrepresentations and omitted facts necessary to make the statements that were made not misleading. *Id.* at 717–18. Since plaintiff complained of misstatements and omissions "within the four corners" of a particular document, the court held, the case was really one involving misrepresentations. The alleged "omissions," the court suggested, were really "omissions in the nature of misrepresentations (misleading statements, half-truths)." *Id.* at 717 n. 2. Since the *Affiliated Ute* presumption of reliance exists primarily because of the practical impossibility of proving reliance where no statements are made, its underlying rationale does not logically apply in a case in which the "omissions" are the type that can be said to exist only because of other, positive statements that the company has made. *Id.* at 716–17.

A similar analysis was employed in *Wilson v. Comtech Communications Corp.*, 648 F.2d at 93–94. In *Wilson* the essence of the complaint was that statements that were reasonable when made later became misleading in light of the company's failure to disclose new information. Defendant sought to characterize the case as one of misrepresentation; plaintiff sought to characterize it as one of omission. The court stated that

[t]o characterize this, for purposes of establishing reliance, as either an omission or a misrepresentation case is to beg the question. In many instances, an omission to state a material fact relates back to an earlier statement, and if it is reasonable to think that that prior statement *still stands*, then the omission may also be termed a misrepresentation. The labels by themselves, therefore, are of little help. What is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute*, in which no positive statements exist: reliance as a practical matter is impossible to prove. The situation here does not present that problem.

· · · · ·

It is the failure to correct [the] projections of which Wilson complains. If we assume ... that appellees had a duty to correct the projections once new information made them inaccurate, then ... Wilson must demonstrate that he relied on [the projections] in making his purchases of Comtech stock.

*Id.* at 93–94.

*Wilson* and *Vervaecke*, therefore, distinguish between cases like *Affiliated Ute* in which no representations whatsoever were made, and cases in which positive statements were made and the alleged "omissions" amount to non-disclosures of information needed to correct or clarify the statements. *Accord, Lorber v. Beebe*, 407 F.Supp. 279, 289 (S.D.N.Y.1975); R. Crane, *supra*, at 106–07 (citing additional cases).

The course of conduct alleged in the instant complaint is based primarily on several documents and statements issued by Waste Management. In the company's 1981 annual report, Waste Management stated that it "set the standards for the entire industry" for environmental excellence, among other things, and that the company's growth was in large part the result of "environmentally sound handling of a broad range of materials." Further, the report stated that the company was "responsive to public concern for the protection of the environment" and that it had adopted "stringent company-wide procedures designed to safeguard natural resources." The report did not disclose various environmental violations and illegal conduct by the company, and the potential financial exposure caused by that conduct. Among the alleged violations were illegal transport and disposal of chemical wastes, improper storage of wastes, and attempts to cover up the alleged violations of law. Amended Complaint ¶¶ 29(a)–(e).

Three quarterly reports issued by the company in 1982 stressed the company's continued growth and contained optimistic statements about future prospects. These documents also failed to disclose the conduct described above and the resulting potential financial exposure. The prospectus issued in connection with the Chem-Nuclear merger falsely stated that the company's operations and prospects were sound and implied that the company had taken all necessary steps to comply with applicable environmental regulations. It, too, omitted the environmental violations described above. The same was true of a prospectus issued in November 1982 concerning a public offering of Waste Management stock. Finally, a February 1983 press release issued by the company announced the company's net income for 1982 and stated that the company had performed well despite stringent new requirements for issuing permits for hazardous waste facilities.

It can readily be seen from the above description that some of the documents issued by defendants, including the 1981 annual report, are perhaps better characterized as containing alleged affirmative misstatements about Waste Management and as omitting additional material facts that are required in order to make the statements not misleading. These documents fall squarely within the analysis employed in *Wilson* and *Vervaecke*. Other documents, such as the quarterly reports and the February 1983 press release, are better characterized as involving just omissions, for they do not contain any representations at all concerning the extent of Waste Management's regulatory compliance.

Of course, there is no evidence that Grossman (or for that matter Frohlick) ever read these documents, so at least as an initial matter classification of this case as one of misrepresentations or one of omissions does not make much difference. If it were the former, plaintiffs would have failed to offer any affirmative evidence of reliance; if it were the latter, defendants' evidence that plaintiffs never read the documents would suffice to rebut the presumption established by *Affiliated Ute,* since plaintiffs cannot be said to have relied on something they never read. *See* cases cited *supra* at 401. However, plaintiffs suggest that they seek to advance a claim that they indirectly relied on the documents even though they did not read them, for the investment advisors upon whom they relied had read the documents and relied on them. As defendants correctly point out, there is no evidence that Zweig, Value Line, or Standard & Poor's reviewed the documents containing the alleged "omissions." If this is a misrepresentation case, then the burden of proof of reliance lies on plaintiff, and the lack of positive evidence would dictate entry of summary judgment in defendants' favor on the claim. If, however, the case is one involving primarily omissions of material fact, then it seems to us that it is up to defendants to rebut the presumption of causation by showing that Zweig *et al.* did not read or use the documents.[5]

For purposes of summary judgment, and on the present record, a theory of indirect causation is an appropriate one. *See Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *vacated as moot,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *see also* cases cited at n. 4 *supra.* Though the causal chain is certainly weaker than in the normal case, and though a jury might conclude at trial that it is in fact nonexistent, for present purposes plaintiffs' theory is a viable one. Thus we must decide whether the case is one of omissions or misrepresentations, in order to determine who bears the burden of proof with respect to the investment analysts' reliance.

The case we find most like the present one is *Frankel v. Wyllie & Thornhill, Inc.,* 537 F.Supp. 730 (W.D.Va.1982). In *Frankel* the misrepresentations were inflated property appraisals. Plaintiffs also alleged that omissions existed, including any basis by which to compare the properties in question with other similar properties. The court stated that the case involved

> an alleged scheme broader than simply misrepresntations of market value. The appraisals played a small, albeit crucial role in the alleged perpetration of a larger scheme to defraud, involving a large number of participants .... Faced with a welter of misrepresentations and omissions alleged ..., the court finds no logic in requiring proof of reliance as to ... some claims and relieving plaintiffs of that burden as to others.

*Id.* at 730. *Accord, Sharp v. Coopers & Lybrand,* 649 F.2d 175, 188 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).

Under *Frankel* and *Sharp,* a court is to analyze the plaintiff's allegations in light of the likely proof at trial and determine the most reasonable placement of the

---

5. In support of their argument to the contrary on this point, defendants cite *Keirnan v. Homeland, Inc.,* 611 F.2d 785 (9th Cir.1980), in which the court stated that even if plaintiff had advanced a theory of "third-party reliance," "the burden remained on [plaintiff] to show that third parties 'received and arguably had read' [the] materially misleading prospectus." *Id.* at 790. To the extent that this suggests that the plaintiff bears the burden of showing reliance in an "omissions" case, we disagree. Under *Ute,* in an "omissions" case plaintiff's affirmative burden of persuasion is satisfied by proof that the plaintiff purchased or sold securities, that defendant had a duty to disclose, and that defendant failed to disclose material facts. That is sufficient to establish a presumption of causation. It is then up to defendant to rebut the presumption. One way of doing that is to show that the plaintiff did not read the document in which the omissions allegedly occurred. We do not see why a different rule should apply in a case of "third-party reliance." Thus if this is an "omissions" case, defendants bear the burden of demonstrating that the investment advisors here did not read the various reports and prospectuses.

burden of persuasion on the issue of reliance. The factor that tilts the balance in this case is that, as alleged in the complaint, defendants had an affirmative duty to disclose matters relating to pending and contemplated environmental regulatory proceedings and the effects of environmental regulations upon the company's finances. Amended Complaint ¶¶ 31, 32 (citing various SEC rules). Plaintiffs allege that defendants breached that duty. Thus, the case appears to us to involve primarily omissions, and not primarily misrepresentations or omissions involving matters needed to make other representations not misleading. We therefore hold that the burden of proof as to reliance/causation on plaintiffs' *Affiliated Ute* theory lies with defendants. Thus, defendants' failure to offer evidence showing the materiality or lack thereof of defendants' prospectuses and reports to the investment advisors upon whom Grossman and Frohlick relied means that they are not entitled to summary judgment on any "omissions" claim raised by plaintiffs.

We note in closing that we have not examined the propriety of class certification under an "omissions" theory of liability. *See Grossman v. Waste Management, Inc.*, 100 F.R.D. at 786. In addition, though we recognize that the jury at trial might conclude that the documents containing the misstatements and omissions played so small a part on the advisors' recommendations that the presumption of causation may be considered rebutted, we seriously doubt that we will be able to grant summary judgment if the advisors relied on those publications at all, for it is highly likely that issues of fact will exist precluding summary adjudication.

### G. *Chester*

We begin our discussion of Chester's claims by noting that she is not a class representative for plaintiffs' § 10(b) claims. Chester acquired her Waste Management stock as a result of the merger between Chem-Nuclear, of which she was a shareholder, and Waste Management. Chester voted against the merger, but it was approved by Chem-Nuclear's shareholders de-

spite her opposition. It is undisputed that at that point Chester had two choices: to exchange her Chem-Nuclear stock for Waste Management stock pursuant to an exchange ratio established by Waste Management, or request appraisal of her Chem-Nuclear shares, which would have resulted in a cash payment. However, Chester apparently did not realize that she had a right to appraisal:

Q Why did you surrender your stock in exchange for Waste Management stock?

. . . . .

A I believed at the time I surrendered my Chem-Nuclear stock it was something I was required to do as a result of the merger of the two companies.

Q You really had no choice, is that right?

A That is right. I had a choice, but I would have ended up with a worthless certificate.

Q A worthless Chem-Nuclear certificate, is that right?

A Yes.

Chester Deposition at 40.

Plaintiffs argue that Chester was aware that she had a technical right of appraisal, apparently suggesting that she did not believe it a viable remedy. This is an untenable reading of the passage quoted above, and plaintiffs point to no other testimony to show an awareness of appraisal rights. The only reasonable reading of the above testimony is that Chester believed that her choices were to exchange her shares or keep her Chem-Nuclear stock certificate, which would have been worthless since the company would no longer exist after the merger.

 This evidence is sufficient to rebut the presumption of reliance under *Blackie* or any other theory advanced by plaintiffs, particularly in conjunction with Chester's further testimony that she would have surrendered her Chem-Nuclear stock in exchange for Waste Management stock even if she had been aware that Waste Management were subject to a $1 billion liability.

*Id.* at 907–08. In an effort to avoid the result required by Chester's testimony, plaintiffs have attempted to shift ground. Plaintiffs now urge that causation is established because the shareholders who approved the merger were deceived by defendants' omissions and misstatements, and the deception caused the merger to be approved. That event required her to acquire Waste Management shares.

We agree with plaintiff that under *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 635 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), proof that plaintiff's forced sale of stock was caused by the deception of others in the merger context is sufficient to establish causation, and proof of reliance is not necessary. *See also Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1283–84 (9th Cir.1982). Defendants argue that *Vine* should not apply to "forced purchasers," as opposed to "forced sellers," but we need not reach that argument. The problem with plaintiffs' alternate theory is that Chester was not forced to acquire Waste Management's shares by the approval of the merger. Though she had a mistaken view of her rights, she still had the right of appraisal of her Chem-Nuclear shares. Defendants' fraud therefore did not require her to acquire Waste Management stock, though it may have occasioned her disposal of her Chem-Nuclear stock. Nor is there any indication or argument that plaintiff's unawareness of her right of appraisal was caused by the alleged fraud or that she chose not to pursue appraisal because of the price and/or prospects of Waste Management's stock.

Plaintiff's only counterargument is that appraisal is an unrealistic remedy for a small shareholder such as plaintiff. That may well be true, *see, e.g., Pellman v. Cinerama, Inc.*, 503 F.Supp. 107, 110 (S.D. N.Y.1980), but that was not the reason why Chester did not use the remedy here.[6] The

only reason why Chester exchanged her shares was that she felt she had to. Thus we need not address whether a different result would obtain in the case of a shareholder who decided to forego appraisal because of the inadequacy of that remedy. For these reasons, defendants' motion for summary judgment on Chester's 10b–5 claim is granted.

### H. *Request that facts be deemed established*

Among the allegations of nondisclosure in the complaint are charges that defendants failed to disclose various closings of waste disposal sites, suspensions of operations at other sites, and denials of permits for waste disposal. In their reply brief, defendants zeroed in on several specific allegations, offering evidence that disclosure actually had been made. In that brief, they argued that this meant that the fraud on the market allegations were fundamentally deficient. This prompted another round of briefing.

Plaintiffs responded, and we agree, that even if defendants were correct as to the matters referred to in their reply brief, that would not entitle them to summary judgment in their favor on plaintiffs' claims. The remaining allegations of nondisclosure and misrepresentation in the amended complaint were sufficient for the case to survive the motion for summary judgment. However, that does not mean that defendants were entitled to no relief whatsoever. As noted *supra* at 399–400 & n. 1, on a motion for summary judgment, if the case is not disposed of, we may nonetheless determine what matters have and have not been established.

Defendants' request initially concerned seven sites, including Calumet City and Antioch, Illinois; Vickery, Ohio; Emelle, Alabama; Lyncott, Pennsylvania; Lowry, Colorado; and Furley, Kansas. We

---

**6.** In any event, on the evidence now before us we would not be able to find that the appraisal remedy afforded Chem-Nuclear shareholders was inadequate. The prospectus for the merger provided that the costs and expenses of any appraisal proceeding were to be assessed against Waste Management absent a showing that the shareholder arbitrarily, vexatiously, or in bad faith turned down an offer by the company.

agree with plaintiffs that genuine issues of material fact exist as to whether the information alleged not to have been disclosed concerning Calumet City, Vickery and Emelle, was publicly known. Defendants argue, however, that the allegation in paragraph 47(c) of the amended complaint that they did not disclose that regulatory authorities had closed or suspended Waste Management's operations at Lyncott, Lowry, and Furley cannot withstand scrutiny. We do not completely agree with defendants. First of all, the lead-in sentence to paragraph 47 states not that the information was not publicly known, but rather that it was not disclosed in the company's 1981 annual report. Defendants have offered no evidence to contradict that allegation. We agree with defendants, however, that the information in question was a matter of public knowledge and therefore available to "the market." [7] We therefore hold that fact established pursuant to rule 56(d).

■ That leaves the Antioch site. Paragraph 29(d) of the amended complaint states that defendants concealed from the regulatory authorities and the public that, in operating the Antioch site, Waste Management had violated its agreement with the town, which provided that hazardous wastes would not be disposed of there. In addition, the company concealed this activity by late-night dumping, interfering with persons employed by Antioch to report on the site, and refusing to allow tests to be conducted there. In paragraph 47(f), plaintiffs allege that the 1981 annual report failed to disclose that as the result of the violation of the antioch agreement, Waste Management incurred the substantial risk that the town would refuse to permit an expansion of the facility sought by Waste Management. Defendants state in their reply to plaintiffs' supplemental memorandum that their evidence, consisting of newspaper articles, demonstrates "beyond a shadow of a doubt that the denial of Waste Management's request to expand [the] site was publicly known in 1982." However, that does not address the allegation in paragraph 47(f), which states that the company's annual report, alleged to have been distributed in March 1982, did not disclose that the company risked denial of the expansion because of its activities at the site. The earliest article submitted by defendants is dated April 8, 1982.[8] Thus, defendants have not contradicted the allegation in paragraph 47(f).

In attacking the allegation in paragraph 29(d), defendants offer newspaper articles indicating that Antioch's consultant alleged in a public hearing before the Lake County Board in August 1982 that Waste Management had accepted hazardous waste for disposal at Antioch. Allegations of late-night dumping of wastes and interference with the consultant were also aired at the hearings, according to defendants.[9]

The only newspaper article referred to by defendants is an August 11, 1982 article

**7.** Plaintiffs suggest that since some of this information was published in local papers, it was not available to or known by the market. We disagree. This suggestion conflicts with the basic theory underlying plaintiffs' fraud on the market claim, that is, that the price of stock reflects *all* publicly available information. *See LTV,* 88 F.R.D. at 143–44.

Based on defendants' submissions, the information was publicly known as to Lyncott as of April 2, 1981; as to Furley as of January 27, 1982; and as to Lowry as of December 2, 1980.

**8.** Defendants have highlighted a portion of the article stating that Waste Management first announced in December 1981 that it wanted to expand the site, and that "citizen opposition ha[d] grown" since that time. When defendants submit an article not to show the truth of the matters stated therein but rather to show that the information was available to the market, that is a non-hearsay use of the article. Fed.R. Evid. 801(c). However, use of a statement in an article to show that there was public opposition to a site at an earlier date *is* a hearsay use. The article is not admissible for that purpose, and we therefore may not consider it for that purpose on the present motion. *See* Fed.R.Civ.P. 56(e).

**9.** Defendants support this latter allegation by offering a transcript of the hearing. Memorandum in Response to Plaintiff's Supplemental Memorandum, Ex. A–1. We have doubts whether this information was known to "the market," as defendants have offered no evidence that it was publicly reported.

in the *Waukegan News-Sun* that consists of eleven paragraphs. The article reports on a hearing before the Lake County Board's Pollution Control Committee concerning the requested expansion of the Antioch site. The town's consultant, Robert Schloesser, was reportedly questioned at the hearing by attorneys for Antioch and Waste Management. The article reported in detail as to various measurements taken by Schloesser in tests on six wells in Antioch. These measurements refer to "chemical oxygen demand" in the wells; however, Schloesser did not connect these measurements with dumping of hazardous wastes or even with unsafe water. Paragraph ten of the article states,

> [o]ther violations cited by Schloesser in site operations included trenches 100 feet wide instead of 70 as indicated in landfill plans, inadequate ground cover, lack of inspection of the site by state authorities and allegations of Waste Management accepting hazardous materials for disposal.

Reply Memorandum, Ex. A.

The article seems to us to distinguish between matters reported by Schloesser as factual and the "allegations" of acceptance of hazardous wastes. At least for purposes of the present motions, we think that there is a significant difference between a third party's reporting of hazardous waste disposal and an admission by Waste Management that it was accepting hazardous wastes. However, not even the former exists here: all the article reports are "allegations," apparently by someone other than Antioch's consultant, of that activity. This is insufficient in our view to establish for purposes of rule 56(d) that the allegations in paragraph 29(d) of the complaint are groundless.

To summarize, we hold pursuant to Fed. R.Civ.P. 56(d) that the facts alleged in paragraph 47(c) of the amended complaint are incorrect insofar as it is alleged that the information there was not publicly known.

## II
## SECTION 11 CLAIMS

Defendants' motion for summary judgment as to Chester's claim under § 11 of the 1933 Act, 15 U.S.C. § 77k (1982), is based on the assertion that Chester cannot establish a right to recover damages under § 11. The statute provides that the damages recoverable are

> such ... as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof at the time such suit was brought ....

*Id.* § 77k(e). Here Chester held the securities at the time she brought her § 11 claim, and therefore we must look to subdivision (1). Defendants argue that Chester's damages under subdivision (1) are zero.

Chester first asserted her claim in a separate lawsuit, later consolidated here, on March 28, 1983. The parties agree that the market price of Waste Management stock on that date was $44⅝. The parties also agree that, applying the exchange ratio between Chem-Nuclear and Waste Management, Chester "paid" somewhere between $43 and $44 for her Waste Management shares. Applying the formula in § 77k(e)(1), defendants argue that since Chester's shares were worth more on the date of her lawsuit than she paid for them, she is not entitled to recover under the statute.

We note that though § 77k(e) uses "price" for most of its calculations, it expressly refers to "value" as of the date of suit in § 77k(e)(1). This indicates that the

figure we are to use is not necessarily the market price of the stock on the date of suit. Defendants appear to agree with this, but they argue that market price is the primary indicium of value, and they state that plaintiffs have offered no evidence showing that the value of the stock was anything other than the market price. In *Mills v. Electric Auto-Lite Co.,* 552 F.2d 1239, 1247 (7th Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977), a case under § 14(a) of the 1934 Act, 14 U.S.C. § 78n(a) (1982), the Seventh Circuit held that when market value is "available and reliable, other factors should not be utilized in determining whether the terms of a merger are fair .... In a market economy, market value will always be the primary gauge of an enterprise's worth." We agree with that statement as far as it goes, but the Seventh Circuit itself stated that market value is the primary indicium of true value only where "reliable." The market price of a stock is not necessarily a reliable indication of the stock's value, as illustrated by the situation in which a fraud on the market has occurred. *See Beecher v. Able,* 435 F.Supp. 397, 404–05 (S.D.N.Y. 1977) (citing other authorities).

Plaintiffs argue that even after the price of Waste Management stock dropped drastically on March 21, 1982, it may have been "reinflated" due to exculpatory and allegedly misleading public statements by Waste Management officials. We note that such an allegation is absent from the complaint, and thus it is not properly before us. However, on the assumption that plaintiffs will seek leave to amend the complaint, we will address the sufficiency of their showing.[10]

Plaintiffs admit that they have no evidence at this point that defendants' statements "artificially" inflated the market price of the stock. We think that to show such inflation, they will have to show that the statements constituted material misstatements of fact; otherwise, the inflation, if any, was not "artificial," and there would be no basis for determining that the value of the stock was less than the price.[11] Plaintiffs state that they have recently made discovery requests to determine exactly what Waste Management officials said at their March 23, 1982 press conference and their March 24, 1982 meeting with securities analysts in New York City. They state that the fruits of that discovery, combined with the fruits of discovery in the case in general as to whether Waste Management was indeed engaged in illegal activities, will determine whether plaintiffs can prove that the market price of the stock was different from its true value.

■ Though plaintiffs' statement is not in technical compliance with Fed.R.Civ.P. 56(f) since it is not in the form of an affidavit, we are aware of the scope of discovery involved in this case and the necessarily deliberate pace at which it is proceeding, due to the volume of materials involved. We are not inclined to grant summary judgment on the § 11 claim before discovery is complete, particularly in light of plaintiffs' representation, contained in a brief signed pursuant to Fed.R.Civ.P. 11, that discovery is currently proceeding that will enable plaintiffs to address defendants' § 11 argument. Thus, if plaintiffs are granted leave to amend the § 11 claim as discussed earlier, summary judgment will not now be appropriate. Chester's § 11 claim as it now stands is deficient, however, for it does not allege that the post-March 28 price of the stock was artificially inflated by defendants' representations.

### III

### SUMMARY

Defendants' motion for summary judgment as to plaintiff Chester is granted as

---

**10.** Absent such amendment, the § 11 claims are legally insufficient. We agree with plaintiffs that the date of filing of the suit is a "mere fortuity," but that is the date that Congress has unequivocally employed as the benchmark for measuring § 11 damages.

**11.** Plaintiffs have suggested no other way in which the March 29 price of the stock might be different from its true value.

to Chester's § 10(b) claim. Defendants' motions as to plaintiffs Grossman and Frohlick are denied. Defendants' request pursuant to Fed.R.Civ.P. 56(d) is granted in part and denied in part as described in this opinion. Chester's § 11 claim is dismissed with leave to amend within ten days. In light of the pending motion to certify for interlocutory appeal under 28 U.S.C. § 1292(b) our order certifying the § 10(b) and § 11 classes, defendants may wish to consider whether they wish to request certification of the issues raised by the summary judgment motions as well.